Folsom *v.* Merchants' Mutual Marine Insurance Company.

FOLSOM & *al. versus* MERCHANTS' MUT. MAR. INS. CO.

No action can be maintained upon a policy of insurance, where the assured had no interest in the property insured, at the time when the policy was executed, or when the property was lost.

Any *lien* for his advances which may be given to the merchant upon the *outfits* of a vessel for a fishing voyage, by him sold *unconditionally* to the owner of the vessel, is dissolved, when he parts with the possession of the property sold. If the possession of the *vendee* follows *immediately* the conclusion of the sale, *no lien* can attach.

After *such outfits* have gone into the *entire possession* of the buyer, the seller has no interest in them that is insurable, although a lien upon them for his security, was agreed between them.

A policy of insurance will not be invalid, although the commencement and termination of the risk are not distinctly stated, if the intention of the parties with respect thereto can be satisfactorily gathered from its provisions.

Any obscurity in its meaning may be removed by reference to the situation of the parties.

When the place from which a voyage is to be made is not stated in the policy, evidence that the vessel was at a certain port when the policy was executed, and there received on board the property insured, and sailed from thence on the voyage, determines the risk to commence from that *place*.

A deviation afterwards will avoid the policy.

If, after such commencement of the voyage, the vessel stops at a neighboring port for additional men, under the plea of *usage*, such an usage must be proved, as would show that the parties had reference to it when the insurance was obtained.

Of the proofs required to establish such usage.

ON EXCEPTIONS from *Nisi Prius*, APPLETON, J., presiding.

ASSUMPSIT on a policy of insurance made to the plaintiffs on May 17, 1852, " on account of whom it may concern, loss payable to them," on the outfits of schooner Pilot, for a fishing voyage to the " Banks" and back to port of discharge in the U. S.

The writ contained several counts, one of which averred that the insurance would be collected by plaintiffs, as agents and merchants, for owners of said Pilot, to whom the same may in law belong, subject to the plaintiffs' lien thereon.

The policy was read and a demand upon defendants admitted.

The plaintiffs' evidence tended to show, *that* one Partridge was owner of the schooner, and that the captain, as his agent, obtained the outfits for the vessel for a fishing voyage, from the plaintiffs at their store in Bucksport, and that they were to have a lien on the outfits and voyage for their pay, as was customary; this was the understanding; *that* the vessel was seaworthy and sufficiently manned, and the captain sailed from Bucksport on the 18th, or 20th of May, 1852, with seven men on board, sufficient for sailing the vessel, but two more would be convenient and profitable for purposes of fishing; *that* two men had left them at Bucksport, and *there* their places could not be supplied; *that* they sailed to Isle au Haut, part of the town of Deer Isle, and eight miles from other land, not finding men there, went to Deer Isle proper, and failed there; sailed back to Isle au Haut and could obtain but one man; *that* the captain engaged a pilot and while going out of the harbor, bound on the fishing voyage, on the evening of May 31, on account of the current and going down of the wind, the vessel was stranded at a place called Burnt Thoroughfare, upon the north-eastern side of said Isle au Haut; *that* the vessel was badly damaged with the outfits, and under a survey, was sold; *that* Deer Isle and Isle au Haut were on the track of a voyage to the Banks from Penobscot river and bay.

They also introduced evidence tending to show, that vessels leaving Penobscot river and bay, called frequently at the Islands for men and other things; and that it was a common practice for fishermen, to rendezvous there, and that they have called for men when bound for the Banks.

The protest and survey were also in the case.

When the plaintiffs had introduced all their evidence, a nonsuit was ordered on motion of defendants, because the suit could not be maintained in the name of the plaintiffs, and because of a deviation in the voyage.

The plaintiffs excepted.

*J. A. Peters*, in support of the exceptions, that the first reason for the nonsuit was not correct, cited, *King* v. *State Mut. Fire Ins. Co.*, 7 Cush. 1; 5 Metc. 386; Phil. on Ins., 2d ed. 2d vol. 593; *Farrow* v. *Com. Ins. Co.*, 18 Pick. 53.

That there was no deviation, he relied upon the usage which was proved, but if not proved satisfactorily to the Court, it was a matter to be determined by the jury, and a nonsuit was improper. 17 Maine, 465; 2 Gill. & John. 136; *Noble* v. *Kennedy*, Douglass, 510; *Bentaloe* v. *Pratt*, Wallace, 64. He also contended, that the risk did not attach until the final sailing from the Isle au Haut; that the vessel was not prepared for the voyage before. Phil. Ins. vol. 1 2d ed. 355. That the vessel left Bucksport for a temporary purpose, distinct from the object of the voyage, as in the case of a vessel named in *Dennio* v. *Ludlow*, 2 Cains, 3; *Risdale* v. *Newnham*, 3 M. & S. 456, cited in Phil. 1, 364.

*Rowe & Bartlett*, contra, cited, *Forohaw* v. *Chabret*, 3 Brod. & Bing. 158; 3 Kent's Com. 311, 312, 313; 1 Phil. Ins. 481; *Macy & al.* v. *Whaling Ins. Co.*, 9 Metc. 363.

TENNEY, J. — Two material questions are presented by the exceptions. First, had the plaintiffs any insurable interest in the property described by the policy at the time of its execution, and at the time of the loss of the property? Second, had the plaintiffs so conducted in reference to the property, that they were guilty of a deviation in the voyage?

1. The attempted insurance was upon the outfits of the fishing schooner Pilot, bound to the Banks. This does not embrace goods, as a part of the cargo, but in a fishing voyage consists principally in the apparatus and instruments necessary for the taking of fish, &c., and the disposing of them, when taken, in such manner as to bring home the produce of the adventure. *Hill* v. *Patten*, 8 East, 373. In cod fishing voyages as they are conducted in the United States, the outfits consist of the great and the small *general*.

The *great general* is supplied wholly by the owners, and includes the salt for curing the fish, the bait, premium of insurance and some other small articles and expenses. The *small general* is supplied by each man for himself, and consists mostly of the provisions and fuel. The insurable interest of the owners accordingly consists of their interest in the vessel, and the *great general*, and their proportion of the fare or *stock*. 1 Phil. on Ins. 145, 146.

The master of the vessel testified, that Partridge was the owner of the vessel; that she was fitted by the plaintiffs; outfits came from their store in Bucksport; they have a lien on the voyage and outfits, till they get their pay out of the same; such was the understanding; and on cross-examination he stated, "I obtained the supplies of the plaintiffs as agent, and on the credit of Partridge. I told one of the plaintiffs, that they might have a lien on the outfits and voyage for their pay, for that was customary; took no bill of outfits. That was the amount of conversation about the lien. Mr. Partridge, I suppose, was also liable for the goods."

From the evidence of the plaintiffs, the goods constituting the outfits were sold to the owner of the vessel unconditionally, subject only at most to a lien thereon as security for payment for the price under the contract. The evidence does not show what was designed to be the nature and extent of the lien, any further than the word itself imports. Lien has been defined to be the right of one man to retain that which is in his possession, belonging to another, until certain demands of him, the person in possession, are satisfied. *Hammond* v. *Barclay*, 2 East, 235; Story's Agency, § 352. And it is said by Judge STORY, in the same work, § 356, that when liens arise by contract express or implied, they are more properly pledges than liens. And it is an universal principle, that a voluntary parting of the goods will amount to a waiver or surrender of the lien.

In *Seamans* v. *Loring & al.*, 1 Mason, pp. 138 and 139, it is said by Judge STORY, "a lien may be acquired for ad-

vances by a mere possession, under a contract for that purpose, but it is of the very essence of the lien on goods, that possession accompanies it." "A voluntary parting with the goods will amount to a waiver or surrender of the lien." *Brackett* v. *Hayden*, 15 Maine, 347.

The outfits, from their nature and character, were expected to be worn out by use, and to be so disposed of that their identity would not be preserved. And when they were suffered to go into the possession of the purchaser, and were surrendered by the plaintiffs, if it was at the moment that the sale itself was perfected, the lien did not attach; if it was after the purchase had been concluded, the lien was surrendered. It does not appear that there was any agency of the plaintiffs, designed to maintain their possession, and there was no insurable interest in them after the owner of the vessel had the entire possession.

This lien, from the nature of the property and its intended use, is unlike that secured by contract, and to attach to property designed to be modified in its form, without losing its identity, for the purpose of being made more valuable; in which case the surrender of the possession is qualified, and for an object entertained by the parties to the contract, when it was made, and not inconsistent with the constructive possession of the property. *Bradeen* v. *Brooks*, 22 Maine, 463.

It is averred, in the new count filed by leave of Court, that the sum covered by the insurance will be collected by the plaintiffs, as agents and merchants, for the owners of the vessel, to whom the same may in law belong, subject to the plaintiffs' lien thereon. There is nothing in the case showing that the insurance was intended for the benefit of the owner of the vessel, by the plaintiffs, professing to act as his agents, or that they were ever employed for such a purpose. The policy purports to be insurance only of the plaintiffs' interest in the outfits, and it can cover nothing beyond. *King* v. *State Mut. Fire Ins. Co.* 7 Cush. 1; *Cushing* v. *Thompson*, 34 Maine, 496.

2. Was there a deviation and change of the risk purporting to be assumed, so that the defendants are not liable? The policy does not state in terms from what *time*, or from what *place* the risk is to commence. Nothing is said in the contract of assurance, where the outfits were at the time of the execution of the policy; or where they were expected to be when the policy was to attach; or from what port the vessel was to sail upon the voyage.

It has been held to be requisite, that the policy should specify what risk the insurers assume, when the risks commence, and for what period they are to continue, or by what event they are to terminate, though there is no positive regulation by law upon this subject in England or the United States. 1 Phil. on Ins., 436 and 437. When the insurance is on a particular voyage, there is generally no reference to any time. The *termini* are the places *from* and *to* which the vessel is bound. These are to be expressed in the policy, and if left in uncertainty by any omission or blank, or when either appears to have been mistakenly or untruly stated, the policy is void. *Manley* v. *U. S. M. & F. Ins. Co.*, 9 Mass. 85. And it has been said, " if a ship be insured from London to ———," the risk will not attach for want of a sufficient description. Molloy, b. 2, c. 7, § 14. But Courts do not require a very minute accuracy in the description of the risk, and it is in general sufficient, if the intention of the parties in respect to the commencement and ending of the risk can be satisfactorily gathered from the policy; any accidental errors or inconsistency in immaterial circumstances will not defeat the contract. 1 Phil. on Ins. 437.

Contracts are often written hastily, and without great care, and the meaning is not always obvious, without some reference to the situation of the parties contracting. And this reference may remove the obscurity which sometimes is found to exist without it; and it may be as proper to take it into consideration as in other contracts. *Cummings* v. *Dennett*, 26 Maine, 397.

The evidence in the case shows that the outfits came from

the plaintiff's store in Bucksport; that two of the crew had left the vessel at that place; that the policy was executed on the 17th day of May, 1852, and that she sailed from Bucksport on the 18th or 20th of the same month, with a sufficient crew for sailing the vessel; but two additional men were needed to make the proper number for the purposes of fishing. By the notarial protest, it appears that the master and mate of the vessel made oath that the vessel sailed from Bucksport, bound to the Grand Banks; that the vessel at the time of her sailing was tight, strong and substantial, and well and sufficiently manned, and equipped and provided in every respect for such a vessel on such a voyage.

Chancellor Kent, in 3 Com., p. 256, (1st ed.,) says, "the risk upon a cargo is subject to much modification of the parties, but it usually commences from the loading thereof aboard the ship." No valid reason is seen for a distinction between a cargo and the outfits of a fishing voyage in this respect. And it cannot be doubted that the vessel not only sailed from Bucksport, but the outfits were put on board at that port. If there is not such an uncertainty in the risk designed to be covered by the policy, as to make it valid, it is quite certain by the plaintiffs' evidence, that Bucksport was the place at which the policy attached.

But it is contended by the plaintiffs, that the sailing from Bucksport was for a temporary purpose only, designed to proceed to Isle au Haut, which is directly in the way from Bucksport to the Banks, for the purpose of completing the *fishing* crew, in conformity to an usage which the parties to the policy must have understood and adopted, as a part of it when it was executed.

A presumption arises, that parties mean to contract and to deal according to the general usage, practice and understanding, if any such exist in relation to the subject matter. If there be a doubt as to the existence of the custom, it is proper to prove it, as a fact, by evidence. It must be proved by evidence of facts, and not by mere speculative opinion, by means of witnesses, who have had frequent experi-

ence of the custom. 2 Stark. Ev. 453. "Usage can be resorted to," says Judge Washington, "when the law is doubtful, and unsettled, and even then the question must be determined by the usage, and not by the opinion of witnesses." *Winthrop* v. *Union Ins. Co.*, 2 Wash. 7. Usage, to be binding, must be uniform and universal, and not a way of dealing at particular houses. *Wood* v. *Wood*, 1 Car. & P. 59.

An insurance of any particular voyage will imply the liberty to touch at a port, if that be the usage, though the policy contains no express provision for this purpose. But it must appear, that the course is so uniformly pursued, that it may be presumed to be known to the parties. 1 Phil. on Ins. 492, 493. "Customs acquire the form of law, because, as they must be ancient, uniform and reasonable, they must have been generally received, known and approved." *McGregor* v. *Ins. Co. of Pennsylvania*, 1 Wash. 39. *Bentaloe* v. *Pratt*, Wallace, 64, was a case where it was determined that two instances did not constitute an usage, which would affect a policy.

The evidence introduced, and relied upon to prove an usage of fishing vessels bound from Bucksport to the Banks, to touch at Isle au Haut to fill up their crews, which will bring this case within the principle established, has no tendency to produce such a result. Fishing vessels, and others, often touch at harbors, as their various wants and necessities from time to time may require, or render desirable to those having the control of them; and those sailing near the Isle au Haut may touch or rendezvous there, for such objects as witnesses have stated, as they come down the coast or from the rivers and bays in the vicinity; but this evidence carried to any extent, does not amount to the truth of the proposition, that there is an usage, uniform and universal, well established, of vessels sailing from Bucksport to the Banks, to touch at that place on their passage, so that parties to policies are presumed to know and be governed by it.

Again it is insisted, that the vessel did not " sail," in the meaning of the policy, till her final departure from the Isle au Haut, and certain cases are referred to, as decisive of this point. These cases are those in which there was a warranty on the part of the assured to " sail" on or before a specified time. In one where the vessel was insured at and from Savannah, and vessels of heavy burden dropped down to a port several miles below, to take in a part of the cargo, and the vessel insured waited at the latter port, for the recovery of the captain from sickness, it was held that the vessel did not " sail" till her departure therefrom. The other was where goods and freight were insured, at and from Pont Neuf, thirty miles above Quebec, on the St. Lawrence, with warranty to sail on or before Oct. 28. Vessels from Pont Neuf cleared at the custom house at Quebec, to which place the captain had gone to obtain his papers. The vessel dropped down with a crew suitable for river navigation, but insufficient for the voyage afterwards, on Oct. 26th, and arrived at Quebec on the 29th, took in the captain and the residue of the crew, but failing to obtain a pilot, the vessel did not leave the latter port, till the 30th. It was held, that the vessel did not " sail" on the 28th of Oct., or before.

These cases do not decide ·that if the vessels went from Savannah and Pont Neuf in a seaworthy condition, with intention to touch at ports below, in pursuance of an usage which all engaged in the business understood; that the underwriters would not be holden for losses which might have happened before the vessel " sailed" in the technical meaning of the term. The questions were whether the vessels had sailed according to the warranty of the assured, and as a consequence, whether the policies ever attached; not whether there had been a deviation, and the underwriters were excused from their liability under a policy which had become effectual.

If the contract of insurance was from Bucksport to the Banks, without the right to touch at Isle au Haut, under the

policy or otherwise, doing so was a deviation. The case of *Murray* v. *Col. Ins. Co.*, 4 Johns. 443, was a policy on ship and freight, on a voyage at and from Calcutta to New York, with liberty to touch at Madras for trade, and to take in a part of the cargo. The vessel took in the whole cargo at Madras, without going to Calcutta. The Court said, " It is impossible to say that a voyage from Madras to New York is the same as a voyage from Calcutta to New York. The adventure is to begin at and from Calcutta. I should not think it competent for the assured to select at pleasure any point of the *iter*, and say the voyage insured shall begin there."

The vessel went from Bucksport to the Isle au Haut, and stopped there for the purpose of making up the number of men for their fishing crew; then went to Deer Isle, a distance of eight miles, and failing to obtain men, returned to Isle au Haut, and when going out of the harbor the disaster took place. The course taken by the vessel was clearly a deviation, which, upon this ground, is an obstacle to the plaintiffs recovering in the action.

<em>Exceptions overruled. Nonsuit confirmed.</em>

SHEPLEY, C. J., and HOWARD, J., concurred in the result only. — HATHAWAY, J., concurred.